Carlos ALVAREZ, Petitioner,

v.

**Brian FISCHER, Superintendent Sing Sing Correctional Facility Respondent.**

No. 01 CIV. 1351(VM).

United States District Court, S.D. New York.

Oct. 18, 2001.

---

Carlos Alvarez, pro se, Ossining, NY.

### DECISION AND ORDER

MARRERO, District Judge.

Petitioner Carlos Alvarez ("Alvarez") filed this petition for a writ of habeas corpus challenging his conviction on a New York State indictment for narcotics trafficking, to which Alvarez pled guilty. The sole issue raised by Alvarez is whether he was improperly denied a hearing pursuant to *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), following his identification as the suspect in what he contends was an impermissibly suggestive show-up arranged by the police. The identifying witness was the undercover officer to whom Alvarez had sold the narcotics in question. This officer had been engaged in an ongoing undercover investigation of Alvarez's trafficking in drugs and firearms. For the reasons discussed below, Alvarez's petition is DENIED.

## I. BACKGROUND

### A. FACTUAL BACKGROUND AND STATE PROCEEDINGS

Alvarez and three other defendants were indicted on July 24, 1995 on a ten-count indictment alleging a conspiracy to sell controlled substances, illegally possessing and selling firearms and selling heroin and cocaine. The indictment charged that on April 2, 1995, Alvarez and another person met an undercover officer, later identified as undercover officer UC 3714 (hereinafter "UC 3714"), at 435 West 125th Street, Apartment 2D, New York, New York, the same address identified as Alvarez's residence at the time of his arrest (hereinafter the "Residence"). There, Alvarez sold a firearm to UC 3714 and arranged for a heroin transaction. Alvarez then directed UC 3714 to East 106th Street, between First and Second Avenues, to show him his narcotics selling spot.

According to the indictment, Alvarez had subsequent contacts and transactions with an undercover officer, whom the State contends was UC 3714. Specifically,

on April 6, 1995, Alvarez and at least one other person met with UC 3714 in Manhattan and then traveled to Queens, picked up a paper bag and returned to the Residence where Alvarez sold to the officer 50 bundles of heroin. Alvarez and an undercover officer had a discussion on April 9, 1995 regarding a future sale of heroin. One day later, Alvarez and a co-defendant sold a firearm to an undercover officer at the Residence. Over the telephone, on April 12, 1995, Alvarez discussed a sale of heroin with an undercover officer and later met with him in the Bronx at which time he sold the officer 20 bundles of heroin. Following another telephone conversation between them, Alvarez informed the undercover officer that he had additional bundles of heroin for sale. Alvarez then sold 30 bundles of heroin and 100 grams of cocaine to the undercover officer in Manhattan on April 17, 1995 and 30 more bundles of heroin on April 19, 1995.

Following Alvarez's indictment and subsequent arrest on May 1, 1995, the State provided a volunteer disclosure form (hereinafter the "VDF") to Alvarez that gave notice of the prosecution's intent to introduce evidence of two police-arranged identifications of Alvarez: a photo identification purportedly made at a police station by UC 3714 on April 2, 1995 at 6:15 pm; as well as a confirmatory identification of Alvarez made by UC 3714 in front of 430 West 125th Street at the time and place of Alvarez's arrest at 1:30 pm on May 1, 1995. The VDF detailed Alvarez's unlawful transactions occurring on the dates and places described above.[1]

On August 30, 1995, Alvarez, by counsel, moved to suppress the identification testimony and for a hearing on the matter pursuant to *Wade*. Alvarez claimed that he was presented singly to an undercover police officer witness at a "show-up" as opposed to a line-up. Alvarez also argued that at the time of the showing he was handcuffed and surrounded by police officers following his arrest and that he had not been identified previously.

The State countered that Alvarez and UC 3714 had a prior relationship, as confirmed by an affidavit executed by Detective Alfred Hernandez ("Hernandez") in support of a warrant to search the apartment of Nathaniel Parker, a/k/a "Tee," one of Alvarez's co-defendants. UC 3714 provided the evidentiary detail for Hernandez's affidavit. According to the affidavit, UC 3714 was involved in a long term investigation, in the course of which, on April 2, 1995, UC 3714 observed one "JD Tee" hand a large sum of money to an already "apprehended individual" whom the State identified as Alvarez. At that time that individual told UC 3714 that their location, East 106th Street between First and Second Avenues, was his drug selling spot.

Hernandez's affidavit further stated that on April 6, 1995, UC 3714 met with Alvarez and the other individual, i.e., JD Tee, at the drug selling spot to discuss a sale of heroin. There, Alvarez allegedly told JD Tee to get another brick of heroin and some money and to bring both to the East 106th Street spot. Alvarez and UC 3714 proceeded by car with JD Tee to 205 East 105th Street, where JD Tee entered and emerged from the building with a large

1. Although the VDF itself is not available for review, descriptions of the contents of the VDF are available in the record. In particular, this Court relies on the description of the VDF contents available in Alvarez's (Proposed) Supplemental Brief for Defendant Appellant made to the New York Appellate Division of the Supreme Court. That information should be regarded as accurate for the purpose of deciding Alvarez's petition because it was prepared by an attorney bound by ethical rules, and portrays the VDF contents in the light most favorable to Alvarez.

sum of money he handed to Alvarez. At that point, according to the affidavit, UC 3714 observed Alvarez give instructions to JD Tee to obtain a brick of heroin and open the heroin selling spot and that he then accompanied Alvarez to the location where they observed JD Tee's activities.

Alvarez's motion for a *Wade* hearing was denied on October 18, 1995. Pursuant to a plea agreement, on March 11, 1996 Alvarez pleaded guilty to one count of the indictment, criminal sale of a controlled substance, in the second degree, based on the April 6, 1995 heroin transaction. He was sentenced, with a 1989 predicate felony conviction for grand larceny, to a term of nine years to life imprisonment.

### B. STATE APPELLATE PROCEEDINGS

Alvarez appealed his conviction, arguing that the trial court improperly denied his motion to suppress the identification without a *Wade* hearing. On September 28, 1999, the State Appellate Division affirmed the trial court's decision, ruling that "[t]he identifications in this ongoing undercover operation were clearly confirmatory." *People v. Alvarez,* 264 A.D.2d 660, 696 N.Y.S.2d 16, 17 (1999). On October 29, 1999, the New York State Court of Appeals denied Alvarez's leave for further review. *See People v. Alvarez,* 94 N.Y.2d 797, 700 N.Y.S.2d 431, 722 N.E.2d 511 (1999). Alvarez's petition for a writ of habeas corpus, now before the Court, was filed on February 23, 2001.

### II. DISCUSSION

The sole ground on which Alvarez bases his petition for habeas corpus is that the trial court should not have denied, without a *Wade* hearing, his motion to suppress UC 3714's identification evidence on the ground that it was impermissibly suggestive. The State argues that UC 3714, as

the identifying officer, had been engaged in a long term operation during which he had purchased drugs and firearms from Alvarez on several occasions in face-to-face transactions over a period of more than two weeks. Thus, according to the State, the allegedly unduly suggestive procedures—a photo identification that occurred immediately following the first of several transactions and a confirmatory identification at the time of Alvarez's arrest—cannot have had a constitutionally impermissible effect on the officer's identification testimony.

### A. STANDARD OR REVIEW

 Alvarez's petition was filed on February 23, 2001 and is governed by 28 U.S.C. § 2254, as amended by the Anti–Terrorism and Effective Death Penalty Act ("AEDPA"). *See Morris v. Reynolds,* 264 F.3d 38 (2d Cir.2001). Under AEDPA, a federal court may not grant a writ of habeas corpus with respect to any claim that was "adjudicated on the merits" in the state court unless the state court decision is either contrary to clearly established federal law or involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d); *Morris,* 264 F.3d at 46 (citing *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Clearly established federal law refers to the holdings only, not the dicta, of the United States Supreme Court. *See id.* The state court's application of clearly established federal law must be objectively unreasonable, not merely erroneous. *See Williams,* 529 U.S. at 387 n. 14, 120 S.Ct. 1495; *accord, Clark v. Stinson,* 214 F.3d 315, 320–21 (2d Cir. 2000). Accordingly, because the claim Alvarez raises in his petition was adjudicated on the merits in the State proceedings, this Court is constrained under § 2254(d) to

give due deference to the State court's final decision unless that determination is deemed to be an unreasonable application of, or contrary to, clearly established federal law.

## B. *WITNESS IDENTIFICATION HEARINGS UNDER WADE*

In *Wade*, the Court held that an evidentiary hearing was required to determine whether a witness identification of a defendant was reliable apart from identification in a line-up at which the defendant's counsel was present. *See Wade*, 388 U.S. at 242, 87 S.Ct. 1926. General principles of federal law determining when testimony concerning the identification of a defendant may be excluded as impermissibly suggestive were elaborated further by the Supreme Court in *Manson v. Brathwaite*, 432 U.S. 98, 106–114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). There, the Court stressed that "reliability is the linchpin in determining the admissibility of identification testimony." *Id.* at 114, 97 S.Ct. 2243.

■ An alleged impermissibly suggestive identification procedure must be weighed against other considerations which may support reliability. Such factors would include the witness's opportunity to view the accused at the time of the crime; degree of attention; accuracy in connection with any prior description and degree of certainty; as well as the passage of time between the crime and the confrontation. *See id.* Most pertinent to the case at bar, the Court noted that even if the identification procedure is challenged as impermissibly suggestive, there must be, taking account of all the circumstances, "a substantial likelihood of irreparable misidentification" before the matter will give rise to a federal constitutional question. *Id.*

■ The Supreme Court has not established definitely the circumstances under which a pre-trial hearing on the admissibility of identification testimony is constitutionally demanded. The Court has declared, however, that ordinarily the failure to hold a hearing, even if erroneous, will not cross the threshold of constitutional violation. *See Watkins v. Sowders*, 449 U.S. 341, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981). In *Watkins*, the Supreme Court concluded that, while pre-trial evidentiary hearings on the admissibility of a witness' identification of a defendant may often be advisable, and in some circumstances even compelled, "it does not follow that the Constitution requires a *per se* rule compelling such a procedure in every case." *Id.* at 349, 101 S.Ct. 654. The Court reaffirmed that "it is the reliability of identification evidence that primarily determines admissibility." *Id.* at 347, 101 S.Ct. 654. At trial, identification witnesses may be cross-examined and their testimony challenged during argument to the jury. *See id.* at 348, 101 S.Ct. 654.

■ Because the Supreme Court has explicitly declared that there is no *per se* constitutional rule compelling an evidentiary hearing with regard to witness identification of an accused, nor has it clearly articulated the circumstances under which a pre-trial hearing may be constitutionally necessary, the State's denial of Alvarez's motion to suppress without such a hearing, in itself, could not have been contrary to nor constituted an unreasonable application of clearly established federal law in this matter.

■ Accordingly, consistent with settled doctrine in this Circuit, the determination of whether to hold a *Wade* hearing was a matter within the trial court's discretion; this Court reviews the decision not to hold a hearing for abuse of discretion. *See United States v. Finley*, 245 F.3d 199, 203 (2d Cir.2001); *United States v. Archibald*,

734 F.2d 938, 940 (2d Cir.1984), *mod. on other grounds,* 756 F.2d 223 (2d Cir.1984). Nothing on the record of Alvarez's petition presents any evidence that the State courts' determinations concerning Alvarez's conviction constituted clear unconstitutional error or even abuse of discretion. To arrive at any contrary result this Court would have to substitute its own judgment for that of the State trial court's, which was exercised within a range of permissible discretion.

■ The decision not to hold an evidentiary hearing is rarely presented in isolation of a challenge to the evidence's use at trial. Indeed, in *Finley,* the Second Circuit addressed decision not to hold a *Wade* hearing after focusing on the indisputably constitutional issue of whether the challenged identification was permissible at trial, subject to the more rigorous clear error standard rather than the abuse of discretion test under *Wade. See Finley,* 245 F.3d at 203; *Dunnigan v. Keane,* 137 F.3d 117, 129–30 (2d Cir.1998); *Archibald,* 734 F.2d at 940 *et seq.; Brown v. Harris,* 666 F.2d 782, 785–86 (2d Cir.1981). Yet even if a constitutionally tainted identification were admitted at trial, its admission would still be subject to harmless error analysis. *See Dunnigan,* 137 F.3d at 130; *Brown,* 666 F.2d at 787. These cases all instruct that the *Wade* hearing does not derive from mandatory constitutional rule but rather is a discretionary procedure grounded on the reliability of the identification evidence at issue.

■ Here, there was a sufficient basis of independent reliable evidence upon which the state trial court properly could have exercised its discretion to deny Alvarez's request for a *Wade* hearing. Alvarez was identified by an undercover police officer after a first unlawful transaction and soon after his arrest. The second identification was made following numerous personal encounters and telephone conversations that culminated in other unlawful narcotics and firearms sales during the course of a period of more than two weeks.

■ The reliability of such police identification is recognized under federal law. *See Manson,* 432 U.S. at 115, 97 S.Ct. 2243. In *Manson,* the Supreme Court noted that police officers are not casual observers of criminal activities. *See id.* Rather, they receive specialized training for uniquely dangerous undercover work in the course of which exacting attention to detail may be demanded, given that the officers' observations may result in arrests and, ultimately, be subject to cross-examination. *See id.* Similarly, in *United States v. Bautista,* 23 F.3d 726, 730 (2d Cir.1994), the Second Circuit recognized that a confirmatory identification by an officer witness shortly following an arrest represents an essential safeguard by police to ascertain that the proper person is apprehended. That the arrest may be accompanied by ordinary and expected arrangements such as the defendant's appearance handcuffed in the custody of police officers does not by itself subvert the identification as impermissibly suggestive. *See id.*

## C. *NEW YORK STANDARD*

■ Under New York law, an accused who challenges the legality of his identification is presumptively entitled to a *Wade* hearing even if on a motion to suppress the allegedly impermissibly suggestive procedures the defendant fails to assert specific facts establishing the deficiency. *See People v. Rodriguez,* 79 N.Y.2d 445, 583 N.Y.S.2d 814, 593 N.E.2d 268, 273 (1992). This standard applies unless the court concludes that there is no legal basis for a hearing or the factual predicate is insufficient as a matter of law. This test, in fact, may be more rigorous than the

federal doctrine as applied in this Circuit. *See Garcia v. Kuhlmann,* 897 F.Supp. 728, 731 (S.D.N.Y.1995). In *People v. Adams,* 53 N.Y.2d 241, 440 N.Y.S.2d 902, 423 N.E.2d 379 (1981), the New York Court of Appeals enunciated the rule to be applied under state law and rejected the less demanding totality-of-the-circumstances approach that the United States Supreme Court had established in *Manson. See id.* 440 N.Y.S.2d 902, 423 N.E.2d at 382–84. It held that the defect of impermissible suggestiveness compelled the exclusion of the evidence, though the harmless error doctrine would still apply and presumably could overcome the preclusion of the evidence. *See id.*

■ Even under New York's more stringent test, however, confirmatory identifications by undercover officers do not always require *Wade* hearings. Precisely on point, the New York Court of Appeals held in *People v. Wharton,* 74 N.Y.2d 921, 550 N.Y.S.2d 260, 549 N.E.2d 462, 463 (1989), that an identification made by a trained undercover officer involved in a face-to-face drug transaction aware that the defendant would soon be arrested, itself constituted reliable evidence that the identification was not rendered deficient by a viewing of the defendant at the time of arrest. In a similar vein, the State Court of Appeals declared that a *Wade* hearing is not required where the identifying witness "is so familiar with the defendant that there is 'little or no risk' that police suggestion could lead to a misidentification." *Rodriguez,* 583 N.Y.S.2d 814, 593 N.E.2d at 272.

■ Recognizing the risks inherent in routinely classifying defendant identifications by police officers as confirmatory, the Court of Appeals noted that such a characterization would not, by itself, suffice to overcome the presumption demanding a *Wade* hearing. *See Wharton,* 550 N.Y.S.2d 260, 549 N.E.2d at 465. Nonetheless, when a sufficiently reliable factual basis supports a finding that the identification was confirmatory, no *Wade* hearing is required. *See, e.g., People v. Rampersant,* 272 A.D.2d 202, 708 N.Y.S.2d 70, 71 (2000); *People v. Reyes,* 256 A.D.2d 242, 682 N.Y.S.2d 190, 191 (1998); *People v. Almonte,* 181 A.D.2d 736, 581 N.Y.S.2d 67, 68 (1992).

■ New York courts have identified several factors to consider in determining whether the identification is confirmatory: (1) how soon after the observed crime the identification occurs, *see Almonte,* 581 N.Y.S.2d at 68; (2) the length of time over which the officer observed the defendant, *see id.,* and (3) whether the observation of criminal activities was face-to-face. *See Reyes,* 682 N.Y.S.2d at 191. In *Reyes,* for example, because the transaction had been "a lengthy face-to-face encounter," a motion to suppress was denied without a hearing where the identification was eight days after the transaction. *Id.* at 191.

Of course it is not the function of this Court to pass upon whether New York law was correctly applied in Alvarez's case. However, that New York law imposes a more exacting standard on the admissibility of identification evidence than federal law demands is a consideration that bears significantly on weighing whether the state courts' decision here contradicted or reflected an unreasonable application of clearly established federal law. In this Court's review of the record accompanying Alvarez's petition, there was no such deviation from federal law here, nor any abuse of discretion. Taking account of UC 3714's extensive personal contact with Alvarez over the course of several face-to-face transactions spanning more than two weeks, his identification of Alvarez soon after his arrest was not made under impermissibly suggestive conditions and, in

any event, was independently reliable in spite of any such circumstances.

UC 3714's first photo identification of Alvarez on April 2, 1995 occurred, according to the VDF, at 6:15 p.m., only slightly more than one hour after their first unlawful, face-to-face transaction during which the undercover officer purchased a firearm from Alvarez at Alvarez's residence. Subsequently, Alvarez engaged in five more unlawful transactions with UC 3714. Moreover, the identification of Alvarez by UC 3714 on May 1, 1995 occurred at the time and place of arrest and on the same street where the Residence in which some of their previous transactions occurred was located. The VDF, in fact, credits UC 3714 with the arrest.

UC 3714's second identification is not rendered unreliable because it occurred immediately following Alvarez's arrest. In identifying Alvarez, UC 3714 could not have been improperly influenced by the circumstances surrounding the arrest because UC 3714 was aware of Alvarez's imminent arrest and he was the officer who had purposefully provided the information that led to it. *See e.g. Manson*, 432 U.S. at 98, 97 S.Ct. 2243. This Court concludes that because UC 3714's identification of Alvarez culminated from several previous face-to-face encounters with him fairly proximate to the date of arrest, there is no clear error in the State Appellate Division's determination that the May 1, 1995 identification of Alvarez was "clearly confirmatory." *Alvarez*, 696 N.Y.S.2d at 17.

The Court has considered Alvarez's argument that the indictment is ambiguous in that it suggests that more than one undercover officer was involved in his case because the indictment contains repeated references to Alvarez's encounters and transactions with "an undercover officer," rather than with "the undercover officer" who presumably would have been one and the same person. On this point, the Court has closely examined the record and finds clear and convincing evidence confirming that UC 3714 was the same undercover officer involved in the various interactions and contacts with Alvarez detailed in the indictment.

It is apparent that Hernandez's July 21, 1995 affidavit relies primarily on UC 3714's account of the various events and unlawful transactions that occurred between April 2 and April 17, 1995 involving Alvarez, his co-defendant JD Tee, and UC 3714 at the times and places specified in Alvarez's indictment. A side-by-side comparison of the two documents persuasively reveals that in all material respects the information recounted in Hernandez's affidavit corresponds to the allegations in the indictment and leaves no doubt that the undercover officer referred to as involved in the numerous contacts with Alvarez leading up to Alvarez's arrest on May 1, 1995, is one and the same. Of particular significance is that the police called on UC 3714 to make the photo identification of Alvarez on April 2, 1995, a little more than one hour after their first unlawful transaction, and that Alvarez had substantial face-to-face contact with UC 3714 on that day and numerous times later.

The record also contains the vouchers prepared by Hernandez for the property seized from Alvarez at the time of his arrest on May 1, 1995. These papers indicate Alvarez's address as 435 West 125th Street, Apartment 2D, the same location the indictment identifies as the place at which Alvarez sold firearms to the undercover officer, discussed drug transactions, or sold heroin, on April 2, 6, and 10, 1995. Additional confirmation that UC 3714 was the one officer engaged in the various encounters with Alvarez is contained in the information set forth in the VDF.

In conclusion, UC 3714 and Alvarez spent considerable time together over a two-and-a-half week period. UC 3714 was familiar enough to Alvarez that Alvarez conducted three of the underlying six illegal sales at his own residence. The men traveled to the Bronx and Queens together. Alvarez introduced the undercover officer to his co-conspirators. Although Alvarez's arrest and UC 3714's confirmatory identification occurred twelve days after the date of the last contact between them described in the indictment, the close relationship UC 3714 had developed with Alvarez had already laid a substantial foundation for a reliable identification by that officer.

The Court concludes that there is no evidence of an impermissibly suggestive identification here. Even if there were, the record clearly establishes that there was a separate and reliable basis for the undercover officer's identification of Alvarez. Accordingly, there was no federal error in the trial court's denial of Alvarez's motion for a *Wade* hearing.

### *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that Alvarez's petition for a writ of habeas corpus be denied and that the petition be dismissed; and it is further

**ORDERED** that the Clerk of Court close this case.

As Alvarez has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). *See also United States v. Perez,* 129 F.3d 255, 259–60 (2d Cir.1997); *Lozada v. United States,* 107 F.3d 1011, 1014–16 (2d Cir.1997). The Court certifies that, pursuant to 28 U.S.C. § 1915(a)(3), any appeal from this Order would not be taken in good faith. *See*

*Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

**SO ORDERED.**